IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

TERRI LYN GILLIAM                                                    PLAINTIFF


          v.                        CASE NO.        12-2057


CAROLYN W. COLVIN[1], Commissioner
of Social Security Administration                                    DEFENDANT

## MEMORANDUM OPINION

Plaintiff brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for a period of disability and disability insurance benefits (DIB) and supplemental security income ("SSI") under Title II of the Social Security Act (Act), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I.  Procedural Background:

The plaintiff filed her applications for DIB and SSI on March 11 and March 17, 2009, alleging an onset date of December 31, 2008, due to plaintiff's Arthritis, Degenerative Disc Disease, 2 herniated discs (neck), Heel spnrs, Knee problems, and Severe seasonal allergies. T. 135.  Plaintiff's applications were denied initially and on reconsideration.  Plaintiff then requested an administrative hearing, which was held on May 18, 2010.  Plaintiff was present and

---

[1]Carolyn W. Colvin became the Social Security Commissioner on February 14, 2013.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin has been substituted for Commissioner Michael J. Astrue as the defendant in this suit.

represented by counsel.

At the time of the administrative hearing, plaintiff was 35 years of age and possessed a High School education with some college.  The Plaintiff  had past relevant work ("PRW") experience as a heavy equipment operator  (T. 148).

On July 2, 2010, the Administrative Law Judge ("ALJ") concluded that, although severe, plaintiff's degenerative disc disease of cervical spine with right upper extremity radiculopathy did not meet or equal any Appendix 1 listing.  T. 13.  The ALJ found that plaintiff maintained the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567 (b) and 416.967(b) except the claimant should never climb ladders, ropes, or scaffolds. She cannot overhead reach with her right upper extremity. She needs to avoid concentrated exposure to vibration and hazards such as machinery and unprotected heights. T. 13.  With the assistance of a vocational expert, the ALJ then determined Plaintiff could  perform the requirements of representative occupation such as  marker, racker, and hand polisher.  T. 15.

## II.  Applicable Law:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Id.*  "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision."  *Id.*  As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome,

-2-

or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  If the court finds it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, the court must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.  *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003).  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III.  Discussion:

The Plaintiff contends that the ALJ committed error in failing to find that she met the listing requirements for 1.04 and in improperly discounting her subjective complaints of pain.

**A.  Step Three Evaluation (Listing 1.04)**:

The determination of whether a claimant meets or equals an impairment described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, is made at step three of the disability determination process. 20 C.F.R. § 416.920(a)(4)(iii). During this step, the ALJ has the responsibility to decide whether "medical equivalence" has been established. Id. § 416.926(e). An impairment is medically equivalent under the regulations if it is "at least equal in severity and duration to the criteria of any listed impairment." Id. § 416.926(a). If the ALJ finds that a claimant has an impairment that meets or equals one of the listings, then the claimant will be found disabled. Id. § 416.920(a)(4)(iii). *Carlson v. Astrue*  604 F.3d 589, 592 (C.A.8 (Iowa),2010)

The ALJ determined that "The claimant's condition does not meet the requirements of Listing l.04 because she does not have evidence of nerve root compression, or spinal arachnoiditis[2], or lumbar spinal stenosis resulting in pseudoclaudication[3].

The Listing Requirements for 1.04 are as follows:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. **With:**
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

---

[2]arachnoiditis inflammation of the arachnoidea mater ( One of the membranes that sheathes the spinal cord and brain; the arachnoid is the second-layer membrane).

[3]painful cramps that are not caused by peripheral artery disease but rather by spinal, neurologic, or orthopedic disorders, such as spinal stenosis, diabetic neuropathy, or arthritis

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b

An MRI/CT of the Plaintiff's cervical spine was performed June 11, 2008. (T. 221). The MRI/CT found decreased signal within the intervertebral disc space at C5-C6; there was evidence of small right paracentral herniated nucleus pulposis which indents the right half of the thecal sac and slightly displaces the spinal cord posteriorly and towards the left. (Tr. 221). "The HNP (herniated nucleus pulposus) result showed only mild narrowing of the AP (anteroposterior) diameter of the spinal canal but does displace the spinal cord particularly towards the left." (Tr. 221). "At C6-C7, there was evidence of a small central disc protrusion resulting in only mild indentation of the ventral aspect of the thecal sac." (Tr. 222).

On January 20, 2009 the Plaintiff's treating physician, Dr. Richard Kyle, a Neurologist, stated that his "concern is that the HNP @ C5-6 has increased in size & is now compressing her spinal cord and nerves.  She has a positive Hoffman's sign on the right & this is a clinical sign of spinal cord compression."  (T. 296). Dr. Kyle notes also that he is trying to work with the insurance company to obtain an MRI (Id.) but his efforts to obtain insurance coverage for an MRI were denied. (T. 293).

The Plaintiff was seen for a consultive examination by Dr. Majzoub on August 5, 2009

who noted that the "Hoffman sign[4] was positive bilaterally" (T. 383).  Dr. Majzoub acknowledged that she had a disc herniation but that her range of motion was "mostly normal", her grip strength and finger movement was 5/5.  Her gait was steady and she had no motor or sensory deficits in any of her extremities. (Id.).

ALJ noted, an examination with Dr. Roberto Saez also in January 2009 showed that Plaintiff was doing well aside from her orthopedic problems and that her neck examination was normal (Tr.14, 297, duplicates 315-316). The ALJ also considered the January 13, 2009, examination by Dr. Jared Ennis (Tr. 14, 299-302). Dr. Ennis's musculoskeletal examination showed that Plaintiff's head and neck were within normal limits (Tr. 300). Further, she exhibited full muscle strength and function and normal sensory perception to both of her upper extremities (Tr. 300). She exhibited full muscle strength and function and full appropriate range of motion of her lower extremities as well (Tr. 301). Examination of her spine showed that alignment was normal, range of motion was appropriate for her age, muscle strength of her trunk was appropriate, and straight leg raising was negative (Tr. 300-301). The neurological examination revealed no deficits (Tr. 301).  Dr. Ennis' diagnosis was "Displacement of intervertebral disc, cervical, without myelopathy". (T. 301). This means that he felt there was no functional disturbance to the nerve.

Plaintiff was seen as a new patient with St. John's Medical Center on March 5, 2009, for "herniated disc issues" (Tr. 373). On examination, the physician noted that she had full strength

---

[4]To test for Hoffman's sign, clinicians tap the nail or flick the volar surface of the 3rd finger; if the distal phalanx of the thumb flexes, the test is positive, usually indicating corticospinal tract dysfunction caused by stenosis of the cervical cord.  See  http://www.merckmanuals.com/ professional/musculoskeletal_and_connective_tissue_disorders/neck_and_back_pain/evaluation_of_neck_and_back _pain.html?qt=hoffman test&alt=sh

in her hands and upper extremities, full range of motion of the right knee with mild crepitus and no effusion, sensation intact, and strength good (Tr. 373). Notably, even after this MRI test in June 2008 Plaintiff continued working through December 30, 2008 earning $20,188.15 in 2008 (Tr. 116, 129, 133). In September 2008, she was using a chainsaw at work all day (Tr. 341). Thus, the presence of cervical degenerative disease alone as shown in the MRI scan does not establish that she is presumptively disabled at step three.

Listing 1.04(A) requires a disorder of the spine with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness), accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04(A). Thus, in addition to a spinal disorder and symptoms of pain, the medical evidence must show the following objective signs: (1) limitation of motion of the spine, (2) motor loss (muscle atrophy and weakness), (3) sensory or reflex loss, and (4) positive straight leg raising test results (if involves low back pain). Id. The listing specifies that all of these signs must be established. *See Vossen v. Astrue*, 612 F.3d 1011, C.A.8 (Minn.), 2010.

It does not appear to the court that the Plaintiff has met her burden of establishing that she met the Listing requirements of 1.04

**B. Credibility:**

Plaintiff alleges that the ALJ erred in discrediting Plaintiff's subjective allegations of debilitating symptoms. See Pl.'s Br. at pp. 9-13. In determining a claimant's RFC, " 'the ALJ must first evaluate the claimant's credibility.' " *Wagner v. Astrue*, 499 F.3d 842, 851 (8th

Cir.2007) (*quoting Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2002)).  The ALJ found

that the Plaintiff's medically determinable impairments could reasonably be expected to cause

the alleged symptoms, however, the Plaintiff's statements concerning the intensity, persistence

and limiting effects of these symptoms are not credible to the extent they are inconsistent with

the determined  RFC (T. 13).

The ALJ must consider several factors when evaluating a claimant's subjective

complaints of pain, including claimant's prior work record, observations by third parties, and

observations of treating and examining physicians relating to 1) the claimant's daily activities; 2)

the duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) dosage,

effectiveness and side effects of medication; and 5) functional restrictions. *Casey*, 503 F.3d at

695 (8th Cir.2007) (citing *Polaski v. Heckler*, 729 F.2d 1320, 1322 (8th Cir.1984). The ALJ may

discount subjective complaints when they are inconsistent with the evidence as a whole. Id.

(citing Polaski, 739 F.2d at 1322). "The ALJ is not required to discuss each Polaski factor as long

as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781,

783 (8th Cir.2004).

The ALJ noted that Plaintiff testified that her neck and arm swell and that she has a lot of

pain (Tr. 13). The ALJ noted that she testified that she was unable to keep a job because of

flare-ups of her pain (Tr. 13). She testified that in the last two years, she has had 6 to 7 flare-ups

where she was down for 2 to 3 weeks and her sister had to visit and take care of her and her kids

(Tr. 30).

### a. Daily Activities

Plaintiff testified that she is a single parent to children ages 3, 5, and 11 (Tr. 25, 99, 163).

She testified that she picks her daughter up from preschool at lunch time (Tr. 25-26).  The ALJ noted her testimony that  she gets them off to school and takes care of them at home with dinner, baths, and bed (Tr. 13).  In a function report completed in April 2009, Plaintiff reported that on a typical day, she takes her 10-year-old child to the bus, dresses and feeds her 2-year-old and 4-year-old children, sometimes takes them to day care, runs errands, does a little house work, prepares her own lunch, takes a nap with her kids, prepares dinner, does laundry, washes the dishes, bathes the children, helps her 10-year-old child with homework, puts the kids to bed, watches television, and then goes to sleep (Tr. 163-165). She was able to handle her own personal care activities (Tr. 164). She does cleaning, laundry, light repairs, dishes, and very limited yard work (Tr. 165). She drives (Tr. 166). She shops for groceries, clothing, and household items once or twice a week at Wal-Mart (Tr. 166). She socializes with her family and attends her oldest son's sporting events (Tr. 167). She goes to the library once a week and to her son's baseball practices and games at least twice a week (Tr. 167). She uses the computer for up to 2 hours at a time, depending upon her neck, shoulders, and headaches (Tr. 172).

These activities do not support plaintiff's claim of disability.   *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

### b.  Conservative Treatment

In May 2008 the Plaintiff was instructed to list all of her medications (T. 208, ¶3) and the only medications the Plaintiff indicated she was taking was Clarinex. (T. 206, 211).   In January 2009, however,  the Plaintiff listed her prescribed pain medications as Hoscyamine sulfate (T. 318) and Darvocet (T. 319) and these were listed in her Disability Report filed in March 2009. (T. 145, 189).  In October 2009 the Plaintiff indicated that she was taking Shelaxin, Tramadol and Naproxen. (T. 194). The court cannot determine if the Plaintiff was taking the prescribed medications because there is no record of the Plaintiff's filling any of the prescriptions.  The court notes that when she was discharged from St. John's Express Care in March 2009 there were no medications prescribed  (T. 375) but the Plaintiff indicated that she was taking relevant medications of  Meloxicam [5], Skelaxin [6], and Darvocet (as needed). (T. 378).  Her treating physician also noted on January 15, 2009 that the "current medical regimen is effective; continue present plan and medications". (T. 298).  The conservative nature of treatment prescribed for her pain discounts her allegations of disabling pain.    *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain).

### c.  Functional Restrictions:

As noted above the Plaintiff's treating physician restricted her to "light" work in January

---

[5]Meloxicam (Mobic) is a nonsteroidal anti-inflammatory drug (NSAID). It works by reducing hormones that cause inflammation and pain in the body. Meloxicam is used to treat pain or inflammation caused by osteoarthritis or rheumatoid arthritis in adults.

[6]Skelaxin is a muscle relaxant. It works by blocking nerve impulses (or pain sensations) in the brain. Skelaxin is used together with rest and physical therapy to treat discomfort associated with acute skeletal muscle conditions such as pain or injury.

2009.  Dr. Majzoub, who examined the Plaintiff in August 2009 noted that:

> motor examination did not reveal any weakness in her arms or legs. She did not have any weakness in her biceps, triceps or hand functions. She did not have any weakness in her legs. The sensory examination revealed normal position sense, vibration and pinprick sensation. Her reflexes were 2-3+. The Hoffman sign was positive bilaterally. The hip flexion and Patrick's test were negative. The straight leg raising test was allowed up to 75-80 degrees only. Her lumbar spine examination revealed tenderness over her lumbar spine. Forward bending was full to 90 degrees. Reflexes in her lower extremities were 2-3+. The Babinski sign was absent...Her motor examination did not reveal any weakness in her upper arms including the biceps, triceps or deltoid muscles. She did not have any weakness in her hand grips...The range of motion in her extremities, are provided on your charts. They are mostly normal. Her grip is Grade 5/5 and her finger movements are Grade 5/5. Her gait is steady and she does not require any assistance to walk. She does not have any motor or sensory deficit in any of her extremities. She does not have any muscles spasms or muscles weakness. I feel the patient did not have any difficulty getting up or down. She did not have any difficulty standing or walking."  (T. 383).

Dr. Majzoub acknowledged that the Plaintiff did exhibit pain upon flexion of the neck (T. 383) which he did attribute to a "minute disc herniation" but otherwise she "did not have difficulty standing or walking". (T. 384).  Therefore, although it is clear that plaintiff suffers from some degree of pain and discomfort, she has not established that she is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir.2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).

 "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination."  *Gregg v. Barnhart*, 354 F.3d at 714 (Iowa, 2003);  *Human v. Barnhart*,  2006 WL 2422182, 3 (D.Kan.) (D.Kan.,2006).  The court finds that the ALJ properly discounted the Plaintiff's allegations of disabling pain.

-11-

**IV.  Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision, and thus the decision should be affirmed.  The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

Dated  this June 14, 2013.

*/s/ J. Marschewski*

HONORABLE JAMES R. MARSCHEWSKI
CHIEF U. S. MAGISTRATE JUDGE